WhitakeR, Judge,
dissenting in part:
I disagree with the opinion of the majority only to this extent:
I do not think there is a reasonable doubt about whether plaintiff’s arthritic condition was aggravated during his military service. I am satisfied that the Board of Veterans Appeals was correct in finding on five different occasions that plaintiff’s condition was not aggravated by his service. In rendering these decisions I feel sure that the Board was mindful of the veterans’ regulations relative to reasonable doubt about aggravation, and that there is implicit in each of their decisions a finding that there was no reasonable doubt.
*224 Indeed, it would be quite remarkable if a service of less than five months could possibly have aggravated, except temporarily, an arthritic condition.
Except as noted above, I agree with the majority.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. This claim is before the court pursuant to House Resolution 559, 82d Congress, 2d session, directing the court to proceed, pursuant to sections 1492 and 2509 of title 28, United States Code, and to “report to the House, * * *, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimants.”
2. Plaintiff, Frank C. Torti, was born in 1910, is a United States citizen, and a resident of New Jersey.
3. He was inducted into the Army on March 2, 1943, and served as an enlisted man therein until honorably discharged for physical disability on July 20,1943.
4. Until the time of his induction into the Army, plaintiff had been in good health except as set forth in finding 6. Except for a period at age seven, plaintiff participated in athletics in grammar and high school. During his summer vacations from high school he worked as a skilled laborer on construction jobs. After graduation from high school in 1928, he continued to play baseball and other sports.
5. Plaintiff was employed continuously from his graduation from high school in 1928 until his induction in March 1943, except for a period of unemployment in the depression of the 1930’s. During the five years preceding his induction he was employed by Federal Works Administration in statistical and accounting capacities. From 1928 to 1943, his average loss of time from work for health reasons was two to four days a year. Those absences were occasioned by minor ailments.
*225 6. Prior to his induction in 1943, plaintiff’s disabilities (other than colds and sprained ankles) had been the following :
a. At age seven he was bedridden for np to six weeks as a result of an infected cut on his left foot coupled with poison ivy in the same area, which caused him local pains in addition to groin pains from his stay in bed. This condition left no residuals to plaintiff’s knowledge except scars on his left sole and a hole above the arch near the left ankle.
b. At age seven a possibility of rheumatism and a heart lesion, according to plaintiff’s personal history statement to an examining Army doctor in 1943, although examinations during adulthood have disclosed no existing heart condition.
g. At age 14 a tonsillectomy.
d. In 1938, a slight sprain or metatarsal condition in his right foot which disappeared immediately.
e. In September 1942, a soreness below the right knee lasting about two weeks after treatment with diathermy and bandaging, which resulted from plaintiff stamping vigorously on a snake. An X-ray examination at the time disclosed no structural changes and the condition was diagnosed as “a tear of tenduous fibres, or possibly a pre-patellar bursitis,” which latter bears no known causal relationship to arthritis but possesses a similarity in the areas affected.
7. On October 2,1942, while plaintiff was still undergoing treatment for and convalescing from his injured knee, he underwent a preinduction physical examination, at which no official note was taken of his complaint of a knee condition.
8. On March 2,1943, plaintiff underwent his final physical examination, the report of which noted plaintiff’s complaint of pains in the right knee, as to which the examiners reported “no disability.” He was then found physically qualified for only limited military service due to external hemorrhoids.
*226 9. After a seven-day furlough following his induction, plaintiff commenced active duty at Fort Dix, New Jersey, on March 9, 1943, and then certified that he had incurred no disability since induction and that he was in as good physical condition as at the time of induction. His first day was spent being “processed.” The first night he slept in a tent fully clad because of uncomfortably cold weather.
10. On March 10 and 11, after receiving indoctrination shots, plaintiff was assigned for excessive periods to strenuous manual labor loading and unloading trucks. After a cold shower in the late evening of the latter day (there being no hot water available) a severe pain developed in the ball of plaintiff’s right foot. After superficial treatment at the dispensary, plaintiff was returned to heavy detail, marching and working in the cold.
11. By the following evening, March 12, the condition had affected both of plaintiff’s feet, which had become red, swollen, and so painful that, by the evening of March 13, he could not leave his tent.
12. On March 14 an Army doctor examined plaintiff in his tent, administered pills and elevated his feet, and instructed him to report to the dispensary the next morning. On March 15, after being assisted to the dispensary by two soldiers, plaintiff was taken by ambulance to the station hospital where the cause of his admission was noted as “metatar-salgoa and swelling of feet.” Orthopedic consultation was recommended and plaintiff was told to report the following day. At this time plaintiff was unable to walk and was conveyed to his tent. On his return to the hospital the following day plaintiff was reexamined, advised to have the shoemaker fit metatarsal pads in his shoes, and was directed to return in ten days. At this time his feet had become discolored from the condition, which was diagnosed as having a “metatarsal basis.”
13. Before he was due to return to the hospital, plaintiff received orders transferring him to Fort Benjamin Harrison, Indiana, as of March 24. Because of his difficulty in walking plaintiff received special dispensation on March 23 and was permitted to walk to the railroad station in advance of his contingent, with someone else carrying his barracks *227 bag. He arrived at Fort Benjamin Harrison on March 24 and was assigned to the 3d Finance Training Battalion.
14. During the four or five days following plaintiff’s arrival at Fort Benjamin Harrison he was placed on light detail while being processed, despite which the pains in both feet increased. The painful condition of his feet virtually deprived him of normal means of locomotion. On March 28 at sick call a doctor taped his legs from the arches of the feet to the knees and returned him to duty. Basic training then started and included drills, hikes, obstacle courses, running and other strenuous activities conducted under the cold and wet climatic conditions then prevailing. During this period plaintiff commenced to experience knee pains. By the end of basic training, which was completed on April 24, during most of which time plaintiff performed his duties with his feet or legs taped up, plaintiff was able to walk only with great pain and difficulty.
15. On April 2 plaintiff’s condition was diagnosed at the Fort Benjamin Harrison Station Hospital as “strained longitudinal arches” resulting from line of duty. After having the affected parts taped he was returned to duty. On April 16, his condition was diagnosed as “Pain in feet. Strained feet bilateral” resulting from line of duty. He was placed off duty for 24 hours and then returned to duty, after having the, affected parts strapped. On April 22, his feet and ankles were X-rayed for possible pathology, and it was found that the feet and ankles were essentially normal except for small spurs. He was marked “line of duty” and given no detail for 24 hours. On the following day he was instructed to return to the hospital on April 24 to surgery, was given no duty for 24 hours, and his condition was again marked “line of duty.” On April 25, at sick call it was determined for the first time that plaintiff’s condition was not “line of duty,” but existed prior to induction. He was then returned to duty and ordered to return the following Tuesday to go before a limited duty board. He commenced training school attendance on April 26, although he required assistance to reach there because of his foot condition.
16. On April 27, plaintiff was admitted to the Fort Benjamin Harrison Station Hospital and remained there con *228 tinuously until July 20, 1943, when he was honorably discharged from the Army for physical disability. On admission his condition was given the working diagnosis of “Arthritis, acute, nonsuppurative, severe, right ankle, left knee, both wrists, nonvenereal. Cause undetermined.” At the same time the hospital clinical record portrays plaintiff’s medical history to have been:
Patient states that about 5 years ago he developed some pain in his right foot. This has been present at intervals since that time. He developed some pain immediately after coming in the Army in both feet, and on March 13 he developed pain in the ball of his right foot while on Basic Training. About April 18, he developed some pain in his right ankle; this gradually increased until he vras unable to walk the day before admission. He also today has developed swelling, tenderness of his left knee, as well as in both wrists.
The clinical record also reported:
This patient has chronic inflammatory joint disease which has been present more or less continuously for 5 years, with an attack of rheumatism at the age of 7. At the present time, his joints are finally quiescent with only some moderate residual stiffness and tenderness. This has been his normal state during the past 5 years. It is felt that he will have recurrent exacerbations of his joint disease and for that reason is not fit for military service. Seen by ODD Bd and recommendation for discharge made.
During his stay in the hospital plaintiff developed pains in his left shoulder and neck in addition to the other joints affected.
17. On or about July 10, 1943, a board of medical officers found plaintiff’s disability to be the following:
Arthritis, chronic, acute exacerbation of, nonsuppura-tive, severe, involving the right ankle, left knee, right and left wrists, cause undetermined, nonvenereal. Existed prior to induction. Manifested by swelling, redness, tenderness of the joints, fever, elevation of the sedimentation rate. Cause unknown. Onset of disease in 1938 with exacerbations and remissions ever since. History of rheumatism in 1917. Incapacitates for further military service because of disabling pain, swelling and tenderness in multiple joints. X-ray of chest nega *229 tive. Disability is considered permanent and not suitable for reclassification. Further military hospitalization is not considered necessary as maximum degree of improvement has been attained. Disability not incurred in line of duty and not due to soldier’s own misconduct. Existed prior to induction and has been aggravated, by military service due to basic training requiring drilling and marching. Soldier did not decline treatment for relief of disability.
The board also found that the disability was not incurred in active service, that it existed prior to induction, that it was aggravated by active service, that it was not due to plaintiff’s misconduct, that it was not in line of duty,[1] and recommended that plaintiff be discharged for disability not in line of duty and not due to his misconduct.
18. On account of arthritis, chronic, acute exacerbation of, nonsuppurative, severe, involving the right ankle, left knee, right and left wrists, cause undetermined, nonvenereal and existing prior to induction, and not incurred in line of duty, a certificate for discharge of plaintiff was executed July 6, 1943, and approved by order of the Commanding Officer at Fort Benjamin Harrison on July 13,1943.
19. From the time of his discharge from the Army on July 20,1943, to October 1950, plaintiff suffered periodically from exacerbations and remissions of the ailment giving rise to his discharge. At their peak, in periods which plaintiff characterizes as “flareups,” the exacerbations caused plaintiff to be completely incapacitated and bedridden, unable to perform simple functions, suffering intense pain, and lacking power to move affected joints. Flareups would endure for varying time intervals, and during these states plaintiff would be unable to seek or maintain employment. During the much longer and more extensive periods of remissions, plaintiff experienced in varying degrees pains in his several joints.
At the time of the trial in this case in January 1954, plaintiff had not experienced a flareup since October 1950, but testified that he has been continuously conscious of pain in *230 various joints. During tbe 87-month period preceding October 1950 (back to July 1943), he had experienced 12 major flareups scattered through the intervening years, half of them occurring during the first year following his discharge and rendering him unfit for work. Much of the first year following his discharge plaintiff convalesced in Florida on the advice of his private physician.
In endeavoring to ascertain the effect of plaintiff’s condition on his ability to work, the following summary of the evidence as to plaintiff’s record of employment and record of flareups is relevant:
During the 87 months elapsing between plaintiff’s discharge from the Army in July 1943, and his last flareup in October 1950, he suffered about 12 major flareups (including the last one), some of them apparently extending their disabling effects longer than others. During the same period he was employed approximately 52 out of the 87 months. All but three of the 12 flareups occurred during periods of unemployment. Plaintiff’s sick leave during the periods of his employment was not excessive. Plaintiff’s employment during this total period of 87 months was with five separate employers (including three private and two Federal Government agencies), and of the total of 52 months of employment, 41 were with Federal Government agencies. The three private employments were all of relatively short duration ranging from one to seven months each. Only one private employment of only one month’s duration seems to have terminated as a result of plaintiff’s physical infirmities. All other employments were terminated either because they simply “ran out” or plaintiff transferred voluntarily to a more attractive position. At the time of trial in 1954, plaintiff remained employed by the Public Housing Administration, and his sick leave for the year preceding trial was two days in excess of allowable sick leave.
Since plaintiff’s discharge in 1943, he has remained continuously under the care of a private physician for his arthritic condition.
It is reasonable to conclude from the foregoing summary that, while plaintiff’s physical condition was the causative factor in the termination of only one of his various post- *231 service employments, it precluded him from being gainfully employed during periods of flareups.
20. On July 20,1943, when plaintiff was discharged honorably from the Army, he signed and verified before a notary public a Veteran’s Application for Disability Compensation or Pension in which the information appears as plaintiff’s purported statement supplied by him in the form application that in or about September 1942, he had been treated by a Dr. Boylance for arthritis, and that at some date not mentioned his mother knew he had suffered from arthritis “prior to, during, or since” his military service. While the information inserted in the form application as answers to the printed questions therein is not in plaintiff’s handwriting, and while he does not recall signing the form (although the signature he admits to be his) and affirms his belief that he did not state that he had had arthritis prior to his induction, there is no substantial evidence which would warrant plaintiff’s conclusion that he did not supply such information. It is accordingly concluded that plaintiff’s recollection as to not supplying the information is in error and that in executing the application form on July 20,1943, he supplied all of the information therein contained and verified the same to be true, although the information was apparently in the handwriting of another person.
21. On August 16,1943, plaintiff filed an application with the Veterans’ Administration for service-connected aggravation of arthritis. On September 30,1943, a three-member Eating Board of the Veterans’ Administration (including one member who was a medical doctor and the acting chairman of the Board) rated plaintiff as follows:
On induction examination complained of pain in right knee, obesity was noted. Admitted to hospital 4-27-43 and discharged for arthritis, not L. O. D. _ Kecord shows symptoms prior to induction. Had pain in both feet immediately after coming in service. At time of discharge joints were quiescent with only residual stiffness and tenderness which has been his normal state during past several years. In absence of trauma, aggravation is not shown under criteria defined in Instruction #1, Sections 9 (a & b), Public #144, 78th Congress.
*232 C. Disability not aggravated by service in W. W. II Regulation 1 (a), Part I, Paragraph 1 (a) W. W. II ARTHRITIS, CHRONIC, ACUTE EXACERBATION.
The Veterans’ Administration had not physically examined plaintiff as a preliminary to the foregoing rating.
22. Plaintiff took no appeal from the disallowance of his claim. In 1945, plaintiff presented a claim for service-connected arthritis to the Board of Veterans Appeals, and on July 26,1945, the Board found as follows:
In claim for benefits executed July 20, 1943, the disability was recorded as arthritis and it was stated that the veteran had been treated by Dr. Roylance for arthritis in September, 1942. Statements pertaining to the veteran’s condition have been submitted by Dr. Herman H. Tillis and George M. Gillette. The veteran was examined August 29, 1944, at which time examination did not reveal the presence of any disablement referable' to the arthritic condition and it was stated that no joint pathology was found.
Essential Elements for Entitlement. — There is authority, with limitations, under the governing law and regulations, for wartime service coimection of disability manifested during wartime service unless clearly and unmistakably incurred prior to such service. There is also provision for service connection of a preexisting condition on the basis of aggravation during wartime service.
Evaluation and Discussion of the Evidence. — The records in this case show clearly and unmistakably that the arthritic condition existed prior to service and that there was. a variable clinical course with exacerbations and remissions. The exacerbation reported during service, with the subsequent remission as shown by examination after service does not establish increase in the preservice level of disablement. It is, accordingly, the conclusion of the Board that the evidence in its entirety does not warrant a finding of aggravation.
Decision. — The evidence does not permit the grant of service connection for the arthritic condition.
23. Under date of January 8, 1947, plaintiff signed and filed with the Veterans’ Administration an application for reinstatement of his National Service Life Insurance which had expired on February 10, 1944, due to plaintiff’s default *233 in the payment of premiums. The application contains the following statements under plaintiff’s signature:
* * * As a condition to the reinstatement of this insurance, I do certify that the answers to the following questions are complete and true, to the best of my knowledge and belief:
1. Are you now in as good health as you were on the due date of the first premium in default? (Answer “yes” or “no.”) Yes.
2. Have you been ill, or suffered or contracted any disease, injury or infirmity, or been prevented by reason of ill health from attending your usual occupation, or consulted a physician, surgeon, or other practitioner for medical advice or treatment at home, hospital, or elsewhere, in regard to your health, since lapse of this insurance? (Answer “yes” or “no.”) No. (If “yes” give all dates and full particulars, including the name and address of practitioner and attach to this application a certificate of the practitioner or head of the hospital where treated, with diagnosis, prognosis, and treatment if available.)
3. Have you ever applied for disability compensation, retirement pay, or pension? (Answer “yes” or “no.”) Yes. If “yes” give Claim No. C 3-346-019.
Under date of October 19,1955, plaintiff signed the following affidavit in explanation of the circumstances under which the foregoing application for reinstatement was filed:
I,Frank C. Torti, being first duly sworn, depose and say:
1. That I reside on Livingston Street, Northvale, New Jersey, and am the plaintiff in the case in the United States Court of Claims of Frank C. Torti v. The United States, Cong. No. 4-52.
2. That on January 8,1941, at Hackensack, New Jersey, I signed Veterans Administration Insurance Form 353a, an application for reinstatement of National Service Life Insurance.
3. That the questions numbered 1, 2, and 3 on the Form were asked of me by a Veterans Administration employee who correctly filled in my answers to the said three questions.
4. That in respect of the question numbered 1, “Are you now in as good health as you were on the due date of the first premium in default?”, my affirmative answer was based on my belief that, although my health was not good oh January 8, 1947, it was not worse than it *234 was on February 10, 1944, the date when my insurance lapsed.
5. That in respect of question numbered 2, “Have you been ill, or suffered or contracted any disease, injury or infirmity, or been prevented by reason of ill health from attending your usual occupation, or consulted a physician, surgeon, or other practitioner for medical advice or treatment at home, hospital, or elsewhere, in regard to your health, since lapse of this insurance?”: I had previously applied unsuccessfully for disability compensation with the Veterans Administration based on service-connected arthritis. My negative answer was, there-foi’e, based upon my understanding that the question was directed toward illness, disease, injury, infirmity, ill health, and medical advice and treatment therefor, other than arthritis and treatment therefor.
6. That my affirmative answer to question numbered 3, “Have you ever applied for disability compensation, retirement pay, or pension?”, reflects my understanding of the meaning of question No. 2; that is to say, I assumed that my making an application for reinstatement of life insurance before the same agency which possessed my service medical record and knowledge of my having applied for disability compensation on the basis of such record led me to assume that my arthritis and treatment therefor was to be excluded in answering question No. 2.
7. That my affirmative answer to question numbered 3 should show that there was no intent to evade the truth in my answer to question numbered 2.
24. In February 1949, plaintiff was again examined and the physical and X-ray findings disclosed that the joints were entirely negative except for slight swelling and periarticular tissue thickening in and about the anides. In 1949, an appeal for service-connected arthritis and heart disease was filed with the Board of Veterans Appeals, and on September 20, 1949, the Board found as follows :
Comment. — From a review of the evidence now available, it is the opinion of the Board that the case should be remanded so that arrangements may be made by the originating agency for observation and study of the veteran in a diagnostic center for the purpose of determining the nature and extent of his disabilities.
When this development has been completed, the case should be reviewed by the agency of original jurisdiction and returned to this Board for further appellate consideration, if in order.
*235 25. Plaintiff was examined at the Veterans Diagnostic Center, Washington, D. C. On May 16, 1950, a consultant for the Veterans Administration reported:
At the present time, the patient has no evidence at all of objective joint manifestations. His joints can be put through the full range of motion without pain or discomfort. There is no local heat, tenderness or swelling, and his sedimentation rate is 14 mm/hr. There is a slight depression in his total protein. However, the albumin/globulin ratio is practically within normal limits.
Diagnosis. — Rheumatoid state, from history, now inactive.
It is well recognized that a characteristic of this condition is the occurrence of unexpected relapses and remissions, and furthermore, a patient who has had articular disturbances of this type may, at any time prior to the later decades in life, have an exacerbation. It is my opinion, however, that at the present time this patient should not be considered an individual with a measure-able disability.
This was the first time plaintiff’s condition was diagnosed “rheumatoid state, * * * now inactive.”
26. In 1950, a hearing was had before the Board of Veterans Appeals at which a claim was made on behalf of plaintiff that his inactive rheumatoid state, and the incur-rence of a heart disease, was aggravated by his military service, upon which on September 28,1950, the Board, after a detailed review of the whole case, including statements by plaintiff, his physicians, and his friends, found as follows:
The evidence clearly and unmistakably shows that the condition formerly diagnosed as arthritis involving multiple joints and most recently classified as rheumatic state, inactive, had its inception many years prior to the veteran’s entrance upon active military duty. The acute symptoms during service were similar in nature and extent to those previously experienced and were the usual manifestations of the disease. They do not represent an increase in the basic underlying pathology or disabling effects thereof, and do not afford an adequate basis for a determination that during the period in which the veteran was under military control there was any aggravation of the preexisting disease. There is no evidence from medical or other sources establishing the existence at any time of an organic disease of the heart. Ac- *236 cordingiy, it is the decision of this Board that the evidence does not warrant a determination that the condition classified as rheumatoid state was aggravated during service or that a claimed disease of the heart was incurred therein.
27. In October 1950, plaintiff again underwent a physical examination which resulted in a diagnosis of acute infectious arthritis of the left knee, recurrent (from history). Upon reconsideration of plaintiff’s claim, on January 18,1951, the Board of Veterans Appeals found as follows:
The data recorded for clinical purposes, the information in the report of examination for induction, the sworn statements made by the veteran in his application for disability .compensation, and the Continuity and chi’onicity of symptomatology demonstrated within such close proximity to the date of entering active service, clearly and unmistakably establish that the veteran had multiple inflammatory joint involvement occurring at intervals over a period of years prior to service. After four days of active military service he reported to a dispensary because of joint symptoms. He visited the dispensary on a number of occasions thereafter and was hospitalized after less than two months active duty. He remained in the hospital receiving treatment for his joint condition until he was discharged. It is a known characteristic of rheumatoid state that such disease is subject to unexpected exacerbations and remissions. Such was the course of the disease in the instant case. The veteran had exacerbations before service and he also experienced an exacerbation in service. Before he was discharged, however, the disease was quiescent. Post-service examinations have shown that the veteran has no disability resulting from the disease except during the periods of exacerbation. The regulations administered by the Veterans Administration provide that symptomatic fluctuations of preservice disease during service do not establish increase of disability unless there is advancement of the basic chronic pathology during service. The veteran’s rheumatoid state followed the usual clinical course of the disease without advancement of the basic chronic pathology during his brief period of active service.
In view of the foregoing and after reconsideration of the entire record, it is found that the evidence clearly and unmistakably establishes that rheumatoid state existed prior to service and that such condition was not aggravated by service. Accordingly,- service- connection *237 for rheumatoid state is not warranted and the benefits sought are denied.
28. Upon the request of the House Judiciary Committee, further administrative consideration of plaintiff’s claim was had by the Board of Veterans Appeals and, on July 16, 1951, upon the whole record and the Judiciary Subcommittee’s hearing upon plaintiff’s claim, the following conclusion was reached:
In view of the foregoing and after again carefully reviewing the entire record, in the light of the testimony adduced at the recent hearing before the Subcommittee, it is the conclusion of this Board that the evidence clearly and unmistakably establishes that the rheumatoid state existed prior to service and that there was no increase in the preservice level of such condition as the result of active service. Accordingly, it is the decision of the Board that the grant of service connection for the condition in issue is not warranted.
29. In the course of its various decisions in plaintiff’s case the Board of Veterans Appeals, on several occasions, had noted and considered plaintiff’s statement in his application of July 20, 1943, for disability compensation that he had been treated privately for arthritis prior to his induction (see finding 20, supra). In the several physical examinations which plaintiff underwent at the instance of the Veterans’ Administration no joint pathology was found, although in the examinations in February 1949, periarticular soft tissue thickening around the anides was noted; in October 1950, when plaintiff was seen in the course of a flareup, his left knee joint was swollen, tender, warm, and no motion possible; and in May 1950, “tiny” spurs were found on the lower extremities of his tibiae[2] [roughly, “shinbones”].
30. According to Cecil and Loeb, Textbook of. Medicine, 8th edition, 1951, one of whose editors is Dr. Bussell L. Cecil, a recognized authority on diseases of the joints, rheumatoid arthritis is a chronic constitutional disease of the joints characterized by inflammatory changes in the synovial membrane and periarticular structures, and by atrophy and rarefaction of the bones. In the earlier stages the disease *238 manifests itself as a migratory swelling and stiffness of the joints; in the later stages, by more or less deformity and ankylosis. A large proportion of cases observed in New York City have their onset in the spring months, especially in March. The etiology of the disease is not known but among the important precipitating factors accepted as conducive to its development are: (1) a severe emotional shock immediately preceding its onset; (2) fatigue, either mental or physical; (3) trauma; (4) sudden or repeated exposure to dampness, rain, or cold — “A high percentage of [soldiers] who acquired chronic arthritis gave a definite history of standing in water, marching or sleeping in the rain, or of prolonged exposure to cold weather.”
The onset of the disease may be sudden but is usually gradual. When the onset is acute, the pain and swelling of the joints come on rapidly and are associated with chills, fever, and other symptoms of an acute illness. Whether the symptoms develop suddenly or gradually, the disease eventually assumes a chronic course, the characteristic clinical features being the swelling of the joints, particularly of the fingers, hands, and knees; the symmetrical distribution of the arthritic manifestations; the migratory character of the joint symptoms, especially in the early stages; the tendency of the disease to become progressively chronic, and the eventual ankylosis and deformity of the joints if the disease is not arrested. If the disease is not checked, the patient ultimately becomes a bed-ridden cripple.
In patients who are seen early, there may be no swelling or bony changes present, and the disease is manifested solely by subjective sensation of pain. In these cases, examination of the joint reveals nothing abnormal except possibly slight tenderness on pressure. In the early stages X-rays of the affected joints may be entirely negative.
When the onset of rheumatoid arthritis is acute, the disease may rim a short course with complete disappearance of symptoms for several months or even years. In a majority of cases, however, the condition returns after a lapse of time and with each recurrence takes on a more chronic course.
In cases where the onset is gradual, the disease may run a chronic course extending over years. Periods of compara *239 tive comfort alternate with periods of active advance. With each exacerbation the joints become progressively stiffer and more permanently injured. Muscular atrophy becomes pronounced and flexion deformities appear.
The sedimentation rate is increased in approximately 95 percent of the cases.
Rheumatoid arthritis is subject to spontaneous remissions and exacerbations.
The basic treatment of the disease is complete and prolonged rest. In early cases, hospitalization for from four to six weeks is beneficial but will rarely produce a cure. Cessation of work for six months to a year in the early stages is helpful. In well-established cases, rest in bed for a considerable part of the day with long sleeping hours at night is essential.
The actual number of patients who make a complete recovery from the disease is not known. Often the disease becomes arrested or quiescent, only to flare up again later on. Roughly, about 15 percent recover permanently; 35 percent improve; and 50 percent exhibit persistent or progressive symptoms.
A clinical variant of rheumatoid arthritis, called “palindromic rheumatism” is characterized by multiple afebrile attacks of acute arthritis with pain, swelling, redness, and disability. The attacks appear suddenly, last from a few hours to a few days, and disappear, to recur repeatedly at long or short irregularly spaced intervals. In spite of the frequent recurrences, little or no constitutional reaction or abnormality has been revealed by physical examination or laboratory tests. X-ray reveals no definite abnormalities even after years of the disease and scores of attacks. The prognosis as to recovery is not good. The great majority of patients have frequent occurrences of general pain and swelling in spite of all therapeutic measures, but the joints are never crippled permanently.
31. Plaintiff is a victim of arthritis, but the evidence fails to establish conclusively the particular type. The Army diagnosed the condition as an acute exacerbation of chronic arthritis. Until 1950, the Veterans’ Administration diagnosed it as chronic rheumatoid arthritis involving multiple *240 joints. In 1950, the absence of objective manifestations of pathology in plaintiff’s joints persuaded the Veterans’ Administration to change the diagnosis to “rheumatoid state”, a term for which the record provides no adequate definition. Dr. Koch, who testified as defendant’s witness and had been a member of the several Boards of Veterans Appeals which had rejected plaintiff’s claim on successive occasions, said:
Now my understanding of a rheumatoid state is merely that a man is susceptible and gives evidence at times of acute arthritic flareups.
No evidence appears as to whether “rheumatoid state” is a separate, recognized classification of the arthritic group, or whether it may not be a “catch-all” classification harboring those symptoms of an arthritic nature which defy precise diagnosis and concerning which little is known. No evidence appears as to whether “rheumatoid state” is a condition which results in roentgenological changes in the joint structure.
32. Veterans’ Administration Regulation 1063 provides in pertinent pai'ts as follows:
* * * Determinations as to service-connection, in general, should be based on review of the entire evidence of record in the individual case, with due consideration extended to the defined and consistently applied policy of the VA to administer the law under a broad and liberal interpretation consistent with the facts shown in each case. When, after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding service-connection, such doubt will be resolved in favor of the veteran. [By reasonable doubt is meant one which exists by reason of the fact that the evidence does not satisfactorily prove or disprove the claim, yet a substantial doubt and one within the range of probability as distinguished from pure speculation or remote possibility. It is not a means of reconciling actual conflict or a contradiction in the evidence; the claimant is required to submit evidence sufficient to justify a belief in a fair and impartial mind that his claim is well grounded-. Mere suspicion or doubt as to the truth of any statements submitted as distinguished from impeachment or contradiction by evidence or known facts, is not a justifiable basis for denying the application of the reasonable doubt doctrine if the entire, complete i’ecord otherwise warrants invoking this doctrine. The *241 reasonable doubt doctrine is also applicable even in the absence of official records, particularly if the basic incident allegedly arose under combat or similarly strenuous conditions and is consistent with the probable results of such known hardships.]
$ $ # $ $
(I) Under paragraph 1 (a), (b), and (d), part I, Veterans Eegulation No. 1 (a), as amended, injury or disease, apart from misconduct disease, noted prior to service or shown by clear and unmistakable evidence, including medical facts and principles, to have had inception prior to enlistment, will be conceded to have been aggravated where such disability underwent an increase in severity during service, unless such increase in severity is shown by clear and unmistakable evidence, including medical facts and principles, to have been due to the natural progress of the disease. Aggravation of a disability* noted prior to service or shown by clear and unmistakable evidence, including medical facts and principles, to have had inception prior to enlistment, may not be conceded when the disability underwent no increase in severity during service on the basis of all the evidence of record pertaining to the manifestations of such disability prior to, during, and subsequent to service (subject to the limitations of sec. 105, PL 346, 78th Cong., as amended). * * *
Eecurrences, acute episodes, symptomatic fluctuations, descriptive variations, and diagnostic evaluations of a preservice injury or disease during service or at the time of discharge are not to be construed as establishing increase of disability in the absence of a sudden pathological development or advancement of the basic chronic pathology during active service, such as to establish increase of preexisting disability during service. * * *
33. Veterans’ Administration Schedule for Eating Disabilities, 1945 edition, provides in pertinent parts as follows:
1. Essentials of Evaluative Rating. — * * * A veteran’s disability claim may require reratings in accordance with changes in laws, changes in medical knowledge, and changes in his physical or mental condition, over a period of many years. * * *
* * * *
3. Resolution of Reasonable Doubt. — It is the defined and consistently applied policy of the Veterans’ Administration to administer the law under a broad interpretation, consistent, however with the facts shown in every case. When after careful consideration of all procurable *242 and assembled data, a reasonable doubt arises regarding service origin, the degree of disability, or any other point, such doubt will be resolved in favor of the claimant.
By reasonable doubt is meant one which exists by reason of the fact that the evidence does not satisfactorily prove or disprove the claim, yet a substantial doubt and one within the range of probability as distinguished from pure speculation or remote possibility. It is not a means of reconciling actual conflict or a contradiction in the evidence; the claimant is required to submit evidence sufficient to justify a belief in a fair and impartial mind, that his claim is well grounded. Mere suspicion or doubt as to the truth of any statements submitted, as distinguished from impeachment or contradiction by evidence or known facts, is not a justifiable basis for denying the application of the reasonable doubt doctrine if the entire, complete, record otherwise warrants invoking this doctrine. The reasonable doubt doctrine is also applicable even in the absence of official records, particularly if the basic incident allegedly arose under combat, or similarly strenuous conditions and is consistent with the probable results of such known hardships.
V H* H»
21. Atrophic Arthritis. — Atrophic arthritis, otherwise diagnosed as rheumatoid or infectious arthritis, or arthritis deformans, is characterized clinically by limitation of motion, usually first affecting proximal inter-phalangeal and metacarpophalangeal joints, with atrophy of muscles, deformities, contractures, sublux-ations, and finally, fibrous or bony ankylosis. It occurs before middle age and is usually more or less laterally symmetrical. The onset may be acute with a febrile attack. Initial changes include periarticular and articular swelling, often free fluid, with proliferation of the synovial membrane. Atrophy of muscles begins early and increases to wasting if the disease is unchecked. Late changes include deformities and contractures, sub-luxations, fibrous or bony ankylosis. Early radio-graphic changes include slight diminished density of bone shadow, increased density of articular soft parts, without bony or cartilaginous changes of articular ends. Late radiographic changes are marked diminished density of bone shadow, loss of bone substance or articular ends, subluxation or ankylosis. Nutrition is poor, and emaciation may be marked. * * *
*243 23. Disability Factors. — With atrophic arthritis, the following should receive special attention, in addition to, or in advance of, demonstrable X-ray changes; muscle spasm; soft tissue changes, periarticular and articular, such as synovial hypertrophy, villose hypertrophy, flexion contracture deformities, joint effusion, destruction of articular cartilage; constitutional changes such as emaciation, anemia, muscular and bone atrophy, skin complications, gastro-intestinal symptoms, low basal metabolic rate, capillary stasis, imbalance in water metabolism (dehydration), vascular changes, cardiac involvement, dry joints, low renal function, postural deformities, and low grade edema of the extremities. Joints affected by any of the following should be considered in the rating: synovial or villose hypertrophy, or joint effusion; severe postural changes; scoliosis, etc.; flexion contracture deformities; ankylosis, or limitation of motion of joint due to bony changes; destruction of articular cartilage.
34. Veterans’ Administration Schedule for Eating Disabilities, 2nd edition, 1933, provides in pertinent parts as follows:[3]
It is the defined and consistently applied policy of the Veterans’ Administration to administer the law under a broad interpretation, and ratings of disability should be upon a liberal basis, consistent, however, with the facts shown in every case. When, after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding service origin, the degree of disability, or any other point, such doubt will be resolved in favor of the claimant.
If the claim is supported by substantial evidence, the mere fact that certain other evidence raises a doubt as to the claimant’s right would not justify a disallowance of the claim. Such disallowance would be in order only where the evidence is of such character and weight that there is created a clear preponderance of evidence against the claimant.
In the event the evidence is conflicting, one is not justified in applying the rule or policy of resolving the doubts in favor of the claimant if the true state of facts may be obtained by a preponderance of the evidence.
*244 A claimant is not required to establish the service origin and degree of his disability either to a mathematical or moral certainty. He is required to establish these matters by a preponderance of the evidence * * *.
It is to be remembered, however, in applying this principle that a reasonable doubt must be present; that is, the evidence must be so evenly balanced as to preclude a preponderance thereof either for or against the veteran. Otherwise, this principle is not to be applied.
# ❖ # &
Natings for arthritis will not be assigned unless the diagnosis is supported by clinical, laboratory, or X-ray evidence of definite joint changes.
% % # # #
35. The denials of plaintiff’s claim of service aggravation by the Board of Veterans Appeals were based on a finding of “no demonstrable.abnormal joint pathology.” There are species of the arthritic group of diseases where changes do not occur in the joint structure even after frequent exacer-bations over a period of years.
36. Plaintiff had arthritis prior to his military service, but of an apparently mild nature that did not result in periods of compulsory invalidism nor interfere with his employment or recreation to a degree comparable to his experiences during and after his military service.
37. A reasonable doubt exists as to whether plaintiff’s arthritic condition was aggravated due to his brief military service. The evidence does not satisfactorily prove or disprove the claim, but the doubt which exists is a substantial one and not speculative.[4]
*245 38. The file of the Veterans’ Administration that constituted the administrative record upon which the Veterans’ Administration based its findings was examined in its entirety in the preparation of this report.

 At first glance a finding of “not incurred in line of duty” would seem to conflict with a finding of aggravation by military service. However, it is believed that the former refers to the underlying cause of the complaint having pre-existed active service and hence not incurred in line of duty, instead of the aggravation not having been incurred in line of duty.

 The record does not satisfactorily establish whether or not these objective manifestations constituted, in medical parlance, pathological changes.

 The extent to which the 1933 schedule was superseded by the 1944 schedule Is not made clear by the evidence.

 The following reasons persuade this conclusion, contrary to the finding of the Veterans’ Administration:
(1) The V. A. finding of “no aggravation” rested almost solely on the absence of objective changes or detectible pathology in the structure of plaintiff’s affected joints, yet admittedly certain forms of arthritis leave no such residue after repeated exacerbations.
(2) The marked increase in the number and severity of plaintiff’s “flareups” upon his entry into service and for seven years thereafter, contrasted to the relative quiescence of his condition prior to service, indicates the likelihood of a basic change beyond the normal progress of the disease. Defendant failed to dispel the reasonable doubt thus created nor was it satisfactorily demonstrated that plaintiff’s variety of arthritis was accurately diagnosed by the V. A.
(3) The preservice history of plaintiff’s arthritis was too indeterminate as to origin, nature, and degree of disablement to dispel the doubt as to *245 ¿service aggravation, which latter contrasted vividly with prior episodes in severity, disablement, and duration.
(4) The etiology of arthritis is too obscure to dispel a doubt of service-aggravation resting so largely on a lack of objective pathology in plaintiff's joints.
(5) The Army found that plaintiff’s condition had been aggravated by reason of his military service.